## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

MALCOLM KING
9 LA ROCQUE, MONT DE LAW ROCQUE
ST. BRELADE, JERSEY, C.I.
JE3 8BQ,

        Plaintiff,

                                    Case No. 19-CV-705

    v.

LINK WILD SAFARIS, LLC
701 HOUSTON AVENUE
MINONG, WI 54859-9161,

        Defendant.

## COMPLAINT

Plaintiff Malcolm King, by his attorneys, Halloin Law Group, S.C., complains of Defendant Link Wild Safaris, LLC, as follows:

### PARTIES

1.    Plaintiff Malcolm King is a citizen of a foreign state, the United Kingdom. Mr. King's residence and domicile at all times relevant to this Complaint is in the Bailiwick of Jersey, a British Crown dependency. Decisions that Mr. King made that are material to this action were initiated in part through the State of Wisconsin.

2.    Defendant Link Wild Safaris, LLC (hereinafter "LWS"), also known as Link's Wild Safaris, is a limited liability company incorporated under the laws of

1

the State of Wisconsin with its principal place of business at 701 Houston Avenue, Minong, Wisconsin 54859.

3.     Upon information and belief, all members of LWS are citizens of the State of Wisconsin; therefore, for diversity of citizenship purposes, LWS is a citizen of the State of Wisconsin. Even if a member of LWS is a citizen of a state different from Wisconsin, complete diversity will still exist because Mr. King is a citizen of the United Kingdom. 28 U.S.C. § 1332(a)(2).

## JURISDICTION

4.     The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

5.     Venue is proper in the Western District of Wisconsin under 28 U.S.C. § 1391. Defendant LWS's principal place of business is in the Western District of Wisconsin. Further, a substantial part of the events giving rise to these claims occurred in Washburn County, Wisconsin, a county in the Western District of Wisconsin.

## ALLEGATIONS COMMON TO ALL COUNTS

6.     Mr. King is an accomplished hunter and conservationist with over twenty years of experience hunting on professionally-outfitted hunting trips.

7.     Part of Mr. King's hunting career has been focused on ethically hunting the most varied, difficult, and largest number of species in the world. This type of hunting is sometimes referred to as selective hunting or trophy hunting.

8.    For Mr. King and selective hunters like him, there is no benefit in participating in a hunt for a species or sub-species that the hunter has already hunted and collected. The same is generally true for hunting in regions in which the hunter has already hunted unless the hunter is hunting a new species or subspecies.

9.    Mr. King's selective hunting practices have resulted in numerous awards from highly-regarded hunting and conservation institutions.

10.    International hunting organizations, such as the Conklin Foundation and the Weatherby Foundation, publish lists of game, usually categorized by species, sub-species, or region, which hunters need to successfully hunt in order to be eligible for awards. The most prestigious awards, including the Conklin Award and the Weatherby Award, celebrate hunters who ethically hunt the most varied, difficult, and largest number of species in the world.

11.    Selective hunters often coordinate their hunting expeditions through professional outfitters familiar with the exact species or subspecies of animal being pursued and/or the region of the hunt.

12.    Unlike typical local hunters, selective hunters like Mr. King rely on the advice of professional outfitters like LWS and its agents to arrange hunts in areas where the desired animal can be found.

13.    Professional outfitters arrange travel and accommodations during the time of the hunt with their local agents. The exact location of the accommodations and actual hunt are selected by the professional outfitter.

14.     Due to his age—Mr. King was born in 1944—Mr. King is approaching the end of his selective hunting career and therefore must strategically plan his hunting expeditions in order to accomplish his selective hunting goals and become eligible for the most prestigious international awards.

15.     Before Mr. King's selective hunting career is over, he has three specific animals left to hunt, one of which is the North Baja Desert Bighorn Sheep, also known as an *Ovis canadensis cremnobates*.

16.     The North Baja Desert Bighorn Sheep appears on various international hunting organizations', including the Weatherby Foundation's, published lists of species which make the hunter eligible for certain awards.

17.     On or around 2018, Mr. King endeavored to hunt a North Baja Desert Bighorn Sheep, a distinct and rare subspecies of bighorn sheep which can be found in Mexico.

18.     Mr. King planned to submit his name for consideration for one of the most prestigious hunting awards, the Weatherby Hunting and Conservation Award, after successfully hunting a North Baja Desert Bighorn Sheep.

19.     Mr. King had already hunted other sub-species of bighorn sheep, or *Ovis Canadensis*, and was only interested in a hunt which would exclusively seek a North Baja Desert Bighorn Sheep, or *Ovis canadensis cremnobates*.

20.     At all relevant times, Mr. King was not interested in hunting any other species of sheep or subspecies of bighorn sheep, including a closely-related

4

subspecies of bighorn sheep, the South Baja Desert Bighorn Sheep, also known as *Ovis canadensis weemsi*, which is also native to Mexico.

21.    Mr. King heard about LWS and its owner, Jay Link, through Hunt Europe and its owner, Anton Tonchev. Hunt Europe is another professional outfitter with whom Mr. King had previously arranged multiple international hunting trips.

22.    Upon information and belief, Mr. Link is also an accomplished hunter who understands and appreciates the distinct value each species and subspecies of animal holds for selective hunters like Mr. King.

23.    Upon information and belief, LWS is a well-known, profitable, and prestigious professional outfitter that is staffed and owned by hunters who appreciate the distinction between specific subspecies of animals and their value to hunters.

24.    On or around April 12, 2018, Mr. King told Mr. Tonchev that he wanted to hunt a North Baja Desert Bighorn Sheep.

25.    Upon information and belief, Mr. Link was told that Mr. King wanted to arrange a professionally-outfitted hunting trip for a North Baja Desert Bighorn Sheep.

26.    On or around April 12, 2018, Mr. Link and LWS stated that LWS could arrange a hunt for a North Baja Desert Bighorn Sheep.

27.     On or around April 12, 2018, Mr. Link also represented to Mr. Anton Tonchev that LWS's agent, Rolando Alonzo, expected a North Baja Desert Bighorn Sheep scoring 165 to 180 to be available.

28.     Based on Mr. Link and LWS's representations, Mr. King cancelled other commitments including, but not limited to, attending a family celebration, vacation, and a business meeting.

29.     Mr. King and LWS entered into a contract. Mr. King's service contract with LWS is attached as **Exhibit A**. It is fully incorporated by reference as if set forth herein.

30.     On or around April 13, 2018, Mr. King paid LWS and Mr. Link a premium rate, $51,000, to participate in a professionally-guided North Baja Desert Bighorn Sheep hunt.

31.     LWS selected the place of the hunt.

32.     During the hunt, LWS promised to provide Mr. King with "1 x 1 Professional Guide Services, transportation to and from Loreto Airport," and other services, with the goal of pursuing a North Baja Desert Bighorn Sheep.

33.     LWS selected the "Professional Guide Services" provider and represented that the provider was reputable.

34.     The professional guide services were provided by LWS's agent, Rolando Alonzo.

35.     LWS and Mr. Link promised to have LWS's agent, Ronaldo Alonzo, pick Mr. King up from the Loreto, Baja Sur, Mexico airport and transport Mr. King four hours north to a hunting camp selected by LWS.

36.     The contract explicitly recognized that the hunt was for a "cermnosates [sic] North Baja Desert Sheep Sub Species" in the hunt description.

37.     Under "trip itinerary," LWS represented that Mr. King would be driven four hours north of the Loreto, Baja Sur, Mexico airport to the "hunt unit."

38.     In addition to the $51,000 package fee paid directly by Mr. King to LWS, Mr. King incurred an additional £8,499.81, equaling $11,704.24 at the relevant exchange rate, in transportation costs in reliance on Mr. Link's and LWS's promises that he would be hunting a North Baja Desert Sheep.

39.     Mr. King also incurred additional expenses related to the April 2018 North Baja Desert Bighorn Sheep hunt, including but not limited to additional visa fees.

40.     On April 19, 2018, Mr. King arrived in Mexico for the hunt arranged by Mr. Link and LWS and met LWS's agent, Rolando Alonzo.

41.     Instead of driving four hours north of the Loreto, Mexico Airport to the hunting destination as represented by LWS, Mr. Alonzo drove for approximately one hour before reaching the hunt unit.

42.     When Mr. King asked Mr. Alonzo about LWS's representation that the hunting unit was four hours from the Loreto Airport, Mr. Alonzo stated that they were at the correct location.

43.     Mr. Alonzo also represented to Mr. King that two nearby mountains were the boundary between North and South Baja and assured Mr. King that he would be able to hunt the North Baja Desert Bighorn sheep from the hunting destination.

44.     Mr. King relied on the experience, knowledge, and representations of LWS and its agent throughout the arranged hunt, and before the arranged hunt.

45.     On or around April 22, 2018, LWS's agent, Rolando Alonzo, drove Mr. King to a specific hunting location and identified a specific sheep as a North Baja Desert Bighorn Sheep.

46.     In reliance on LWS's and Mr. Link's representations that the arranged hunt was for a North Baja Desert Bighorn Sheep, and LWS's agent's representations and familiarity with the region, Mr. King successfully shot the identified sheep.

47.     After Mr. King believed he shot a North Baja Desert Bighorn Sheep, he had no need—or the opportunity—to shoot another North Baja Desert Bighorn Sheep while in Mexico.

48.     Unbeknownst to Mr. King, the identified sheep was not a North Baja Desert Bighorn Sheep; it was the distinctly different South Baja Desert Bighorn Sheep.

49.     Also unbeknownst to Mr. King, North Baja Desert Bighorn Sheep are not believed to inhabit the area in which Mr. Link, LWS, and LWS's agent arranged for and took Mr. King to hunt a North Baja Desert Bighorn Sheep.

8

50.     After the hunt and after Mr. King departed Mexico, Mr. King included his successful hunt for a North Baja Desert Bighorn Sheep in his application for the Weatherby Hunting and Conservation Award.

51.     Mr. King was later questioned by the Weatherby Foundation, the presenters of the Weatherby Hunting and Conservation Award, and told that the sheep that he shot could not be and was not a North Baja Desert Bighorn Sheep.

52.     Instead, Mr. King was told by the Weatherby Foundation that the sheep he shot was a South Baja Desert Bighorn Sheep.

53.     A South Baja Desert Bighorn Sheep trophy has no value to Mr. King because he had already participated in a successful hunt for a South Baja Desert Bighorn Sheep.

54.     Failing to successfully hunt a North Baja Desert Bighorn Sheep made Mr. King ineligible for the Weatherby Award, an award which holds great value to Mr. King.

55.     If Mr. King had known that LWS and its agent were not familiar with or knowledgeable about the North Baja Desert Bighorn Sheep, he would not have paid LWS for the hunt or gone on the hunt at all.

56.     On or around June 2018, LWS and Mr. Link affirmatively stated that its agents misidentified the South Baja Desert Bighorn Sheep as a North Baja Desert Bighorn Sheep.

57.     Further, LWS and Mr. Link acknowledged that their agent took Mr. King to a location where the North Baja Desert Bighorn Sheep cannot be found.

58.   On or around June 2018, Mr. Link and LWS represented that Mr. King's $51,000 would be returned to Mr. King because of LWS's and its agent's errors and misrepresentations.

59.   Upon information and belief, LWS and Mr. Link have refused to pay their agent, Rolando Alonzo, due to his failure to reasonably perform his duties under LWS's contract with Mr. King.

60.   Despite Mr. Link's and LWS's representation that Mr. King's funds would be returned, Mr. Link and LWS never returned Mr. King's $51,000.

61.   On May 29, 2019, Mr. King's counsel sent a letter to Mr. Link formally requesting that the $51,000 and additional expenses relating to the hunt be returned to Mr. King.

62.   On June 7, 2019, Mr. Link refused to repay Mr. King and altered course and misrepresented through counsel that Mr. King, not LWS's agent, drove the wrong way (even though Mr. King was being guided and driven by LWS's agent) and Mr. King decided to commence the hunt in the wrong location (even though LWS's agent directed the location of the hunt).

63.   Mr. Link knew that his June 7, 2019 representations were false.

64.   As a direct and proximate result of the foregoing acts, Mr. King was financially harmed in excess of $75,000, has become emotionally upset, was required to retain attorneys, expend numerous hours of time, distress, worry, anxiety, cost and expense given the actions and inactions set forth above. Mr. King also suffered emotional distress from the LWS's fraudulent representations and

intentional misrepresentations which caused him to undertake a number of actions resulting in lost time, expense, worry, anxiety, loss of sleep, physical and mental distress, all to his damages to be further adduced at trial.

**FIRST CAUSE OF ACTION**
**FRAUDULENT AND INTENTIONAL MISREPRESENTATION**
(against Link Wild Safaris, LLC)

65.    Mr. King re-alleges and incorporates by reference all paragraphs of this Complaint as if set forth herein.

66.    As set forth in detail in the preceding paragraphs of this Complaint, Defendant LWS and its agent Mr. Alonzo made numerous representations of fact regarding the hunt, including but not limited to:

a.  LWS and its agent Mr. Alonzo represented to Mr. King that they would provide all that is necessary to allow for Mr. King to obtain the North Baja Desert Bighorn Sheep;

b.  LWS and its agent Mr. Alonzo represented to Mr. King that the area where they actually took Mr. King in Mexico was a location that the North Baja Desert Bighorn Sheep inhabited and could be hunted;

c.  Before the animal was taken, LWS and its agent Mr. Alonzo represented to Mr. King that the animal identified was indeed the North Baja Desert Bighorn Sheep; and

d. After the hunt, LWS and its agent Mr. Alonzo continued to represent to Mr. King that he had taken the North Baja Desert Bighorn Sheep.

67.     These representations of fact were not true.

68.     Upon information and belief, LWS and its agent knew or believed that their representations were false or made such representations recklessly without regard to the truthfulness of the representations.

69.     LWS and its agent intended to deceive Mr. King and intended to induce Mr. King to act upon the misrepresentations and refrain from acting based upon the misrepresentations.

70.     LWS and its agent benefited financially from Mr. King's failed hunting trip.

71.     Mr. King believed LWS's and its agent's representations to be true and relied upon them.

72.     Mr. King justifiably relied upon LWS's and its agent's misrepresentations as set forth in the facts above and spent hours, days, and over $60,000 to hunt a North Baja Desert Bighorn Sheep.

73.     Mr. King sustained damages, including loss of other opportunities, in an amount to be further adduced at trial as a result of LWS's fraudulent misrepresentations and intentional misrepresentations.

74.     As a direct and proximate result of the misrepresentations and omissions, Mr. King has incurred damages in an amount to be determined and

12

specified above. Said damages are in excess of $75,000 and may include compensatory damages, consequential damages, costs of investigation, stigma damages, punitive damages, legal fees and costs and pre- and post-judgment interest.

## SECOND CAUSE OF ACTION
## STRICT RESPONSIBILITY MISREPRESENTATION
### (against Link Wild Safaris, LLC)

75.     Mr. King re-alleges and incorporates by reference all paragraphs of this Complaint as if set forth herein.

76.     As set forth in detail in the preceding paragraphs of this Complaint, Defendant LWS and its agent Mr. Alonzo made numerous representations of fact regarding the hunt, including but not limited to:

    a.  LWS and its agent Mr. Alonzo represented to Mr. King that they would provide all that is necessary to allow for Mr. King to obtain the North Baja Desert Bighorn Sheep;

    b.  LWS and its agent Mr. Alonzo represented to Mr. King that the area where they actually took Mr. King in Mexico was a location that the North Baja Desert Bighorn Sheep inhabited and could be hunted;

    c.  Before the animal was taken, LWS and its agent Mr. Alonzo represented to Mr. King that the animal identified was indeed the North Baja Desert Bighorn Sheep; and

    d. After the hunt, LWS and its agent Mr. Alonzo continued to represent to Mr. King that he had taken the North Baja Desert Bighorn Sheep.

77.    These representations of fact were not true.

78.    LWS and its agent made their misrepresentations to Mr. King based upon their own personal knowledge regarding hunting, and in particular, regarding hunting in Baja California, Mexico.

79.    LWS and its agent made their misrepresentations to Mr. King in circumstances under which they necessarily ought to have known that their representations were not truthful.

80.    LWS and its agent, as professional hunting outfitters, were situated such that they had particular means of ascertaining the falsity of their representations, and their position as professionals made it possible and implied that they had complete knowledge regarding the hunt.

81.    LWS and its agent benefited financially from Mr. King's failed hunting trip.

82.    Mr. King believed LWS's and its agent's representations to be true and relied upon them.

83.    Mr. King justifiably relied upon LWS's and its agent's misrepresentations as set forth in the facts above and spent hours, days, and over $60,000 to hunt a North Baja Desert Bighorn Sheep.

84.    Mr. King sustained damages, including loss of other opportunities, in an amount to be further adduced at trial as a result of LWS's fraudulent misrepresentations and intentional misrepresentations.

85.    As a direct and proximate result of the misrepresentations and omissions, Mr. King has incurred damages in an amount to be determined and specified above. Said damages are in excess of $75,000 and may include compensatory damages, consequential damages, costs of investigation, stigma damages, punitive damages, legal fees and costs and pre- and post-judgment interest.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (against Link Wild Safaris, LLC)

86.    Mr. King re-alleges and incorporates by reference all paragraphs of this Complaint as if set forth herein.

87.    LWS and its agent had a duty of care or voluntarily assumed a duty of care to Mr. King.

88.    As set forth in detail in the preceding paragraphs of this Complaint, Defendant LWS and its agent Mr. Alonzo made numerous representations of fact regarding the hunt, including but not limited to:

    a.    LWS and its agent Mr. Alonzo represented to Mr. King that they would provide all that is necessary to allow for Mr. King to obtain the North Baja Desert Bighorn Sheep;

15

b. LWS and its agent Mr. Alonzo represented to Mr. King that the area where they actually took Mr. King in Mexico was a location that the North Baja Desert Bighorn Sheep inhabited and could be hunted;

c. Before the animal was taken, LWS and its agent Mr. Alonzo represented to Mr. King that the animal identified was indeed the North Baja Desert Bighorn Sheep; and

d. After the hunt, LWS and its agent Mr. Alonzo continued to represent to Mr. King that he had taken the North Baja Desert Bighorn Sheep.

89. These representations of fact were not true.

90. Mr. King believed and relied on LWS's and its agents' misrepresentations to his detriment.

91. LWS and its agents were negligent in making the representations because they failed to exercise ordinary care, failed to exercise the care usually exercised by persons of ordinary intelligence and prudence engaged in their profession, lacked reasonable care in ascertaining the facts, and/or made the representations without the skill or competence required in their profession.

92. Mr. King requests that the Court order that LWS compensate Mr. King for his damages, including compensatory damages, consequential damages, costs of investigation and mitigation, stigma damages, legal fees and costs, and pre- and post-judgment interest.

## FOURTH CAUSE OF ACTION
## VIOLATION OF WIS. STAT. § 100.18
### (against Link Wild Safaris, LLC)

93.     Mr. King re-alleges and incorporates by reference all paragraphs of this Complaint as if set forth herein.

94.     Mr. King is a member of the public.

95.     LWS made and placed before the public statements and representations that LWS could provide professional hunting outfitter services to deliver a successful hunt of the North Baja Desert Bighorn Sheep in Baja California, Mexico.

96.     These statements and representations were made to Mr. King orally, by telephone, and in writing.

97.     The representations and statements made by LWS concerning the hunting of North Baja Desert Bighorn Sheep were untruthful, deceptive, and misleading.

98.     LWS could not deliver a successful hunt of the North Baja Desert Bighorn Sheep.

99.     LWS's statements and representations regarding its ability to deliver a successful hunt of the North Baja Desert Bighorn Sheep were made with the intent to sell hunting services to deliver a successful hunt and to induce Mr. King into buying the hunting services.

100.    LWS's statements and representations materially induced a pecuniary loss to Mr. King.

101.   Mr. King sustained a monetary loss as a direct and proximate result of LWS's statements and representations.

102.   Mr. King has incurred damages in an amount to be determined and specified above. Said damages are in excess of $75,000 and may include compensatory damages, consequential damages, costs of investigation, stigma damages, punitive damages, legal fees and costs and pre- and post-judgment interest.

103.   Mr. King requests an award of attorney fees and double damages, as set forth in Wisconsin Statutes section 100.18(11).

104.   Mr. King's damages also include the loss of other opportunities, in an amount to be further adduced at trial.

<u>FIFTH CAUSE OF ACTION</u><br/><u>BREACH OF CONTRACT</u><br/>(against Link Wild Safaris, LLC)

105.   Mr. King re-alleges and incorporates by reference all paragraphs of this Complaint as if set forth herein.

106.   Mr. King and LWS entered into a service contract on or about April 12, 2018, which included both verbal and written agreements.

107.   The intent of hunting contracts, especially those for a foreign hunt for a specific species, is for the hunter to participate in a once in a lifetime hunting experience and bring back the desired animal to his country of origin.

108.   LWS knew, or should have known, that Mr. King only entered into the contract in exchange for the opportunity to hunt a North Baja Desert Sheep.

109.   Mr. King performed all acts required of him under the contract.

110.   LWS and its agents materially breached the contract when they failed to substantially and reasonably perform their duties under the contract, including but not limited to by failing to drive to the correct area to hunt a North Baja Desert Sheep as provided for by the contract and failing to provide reasonable professional guide services during the hunt of the North Baja Desert Sheep.

111.   LWS and its agents materially breached the contract by failing to deliver what Mr. King bargained for: a successful hunt of the North Baja Desert Sheep.

112.   As a result of LWS's and its agent's breaches, Mr. King has and will continue to suffer damages in excess of $75,000, including compensatory damages, consequential damages, costs of investigation, stigma damages, punitive damages, legal fees and costs and pre- and post-judgment interest, for which LWS is responsible.

## SIXTH CAUSE OF ACTION
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (against Link Wild Safaris, LLC)

113.   Mr. King re-alleges and incorporates by reference all paragraphs of this Complaint as if set forth herein.

114.   Every contract, including service contracts like Exhibit A, imparts an implied duty of good faith and fair dealing. *See, e.g., LDC-728 Milwaukee, LLC v. Raettig*, 2006 WI App 258, ¶ 11, 297 Wis. 2d 794, 802, 727 N.W.2d 82, 85.

115.   This duty continues through performance of the contract. *Id.*

116.    Providing an agent, here Mr. Alonzo, who is neither knowledgeable about the purpose of the hunt, and who misrepresents the location of the hunt and animal being pursued, is a breach of the duty of good faith and fair dealing.

117.    LWS's, and its agents', conduct has been vexatious, willful, wanton, malicious, reckless, and/or in breach of the duty of good faith and fair dealing.

118.    LWS failed to investigate the hunt being arranged for Mr. King.

119.    LWS failed to provide agents as required by the contract who were professional, reputable, and knowledgeable about the hunt.

120.    LWS failed to deliver what Mr. King bargained for: a successful hunt of the North Baja Desert Sheep.

121.    As a direct and proximate result of LWS's and its agents' breaches of the duty of good faith and fair dealing, Mr. King has suffered damages in an amount to be determined at trial. Such damages are in excess of $75,000 and may include compensatory damages, consequential damages, costs of investigation, stigma damages, punitive damages, legal fees and costs and pre- and post-judgment interest.

20

<u>SEVENTH CAUSE OF ACTION</u>
<u>UNJUST ENRICHMENT</u>
(against Link Wild Safaris, LLC)

122.   Mr. King re-alleges and incorporates by reference all paragraphs of this Complaint as if set forth herein

123.   Mr. King's payments to LWS and its agents have conferred a benefit upon LWS by placing LWS in a better condition than when Mr. King purchased the North Baja Desert Bighorn Sheep hunting trip and professional guide services from LWS.

124.   LWS has appreciated the benefit of the funds paid by Mr. King to LWS.

125.   LWS withheld payment from Mr. Alonzo.

126.   Should the Court find the parties' contract unenforceable for any reason, LWS has been unjustly enriched by Mr. King's payment to LWS and its agents.

127.   It would be inequitable to allow LWS and its agents to retain the benefit of Mr. King's payments.

128.   Mr. King requests that the Court award him damages in an amount to be determined at trial, including compensatory damages, consequential damages, costs of investigation, stigma damages, punitive damages, legal fees and costs and pre- and post-judgment interest, for which LWS is responsible.

WHEREFORE, Plaintiff Malcolm King respectfully requests:

a.     A judgment against LWS in an amount to be determined at trial, including compensatory, incidental, consequential, and exemplary damages; attorney fees and costs; and pre- and post-judgment interest; and

b.     Such other and further relief as the Court deems just and equitable.

Dated August 29, 2019.

**HALLOIN LAW GROUP, S.C.**
Attorneys for Malcolm King

s/ James J. Irvine
Scott R. Halloin
State Bar No. 1024669
James J. Irvine
State Bar No. 1088726
Sheila L. Shadman Emerson
State Bar No. 1084786
Molly Stacy
State Bar No. 1098534

HALLOIN LAW GROUP, S.C.
839 North Jefferson Street
Suite 503
Milwaukee, Wisconsin 53202
p 414-732-2424
f  414-732-2422
shalloin@halloinlawgroup.com
jirvine@halloinlawgroup.com
sshadmanemerson@halloinlawgroup.com
mstacy@halloinlawgroup.com
S:\Clients\King, Malcolm\Pleadings\Complaint.Docx